Slip Op. 16-51

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TENSION STEEL INDUSTRIES CO., LTD., | **PUBLIC VERSION** |
| Plaintiff, | Before: Leo M. Gordon, Judge |
| v. | Consol. Court No. 14-00218 |
| UNITED STATES, | |
| Defendant. | |

**OPINION and ORDER**

[Final determination of sales at less than fair value affirmed in part and remanded in part.]

Dated: May 16, 2016

**Kelly A. Slater**, **Jay Y. Nee**, and **Edmund W. Sim**, Appleton Luff Pte. Ltd of Washington, DC for Plaintiff Tension Steel Industries Co., Ltd.

**L. Misha Preheim**, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. On the brief with him were **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, **Jeanne E. Davidson**, Director, and **Claudia Burke**, Assistant Director. Of counsel on the brief was **David P. Lyons**, Attorney, Office of the Chief Counsel for Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

**Robert E. DeFrancesco, III**, **Alan H. Price**, and **Adam Teslik**, Wiley Rein, LLP of Washington, DC for Defendant-Intervenor Maverick Tube Corporation.

**Jeffrey D. Gerrish**, **Robert E. Lighthizer**, and **Jamieson L. Greer**, Skadden, Arps, Slate, Meagher & Flom LLP for Defendant-Intervenor United States Steel Corporation.

**Roger B. Schagrin**, **John W. Bohn**, and **Paul W. Jameson**, Schagrin Associates of Washington, DC for Defendant-Intervenors Boomerang Tube LLC, Energex Tube (a Division of JMC Steel Group), Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final determination in the less than fair value investigation of certain oil country tubular goods ("OCTG") from Taiwan. See Certain Oil Country Tubular Goods from Taiwan, 79 Fed. Reg. 41,979 (Dep't of Commerce July 18, 2014) (final LTFV determ.), as amended, 79 Fed. Reg. 46,403 (Dep't of Commerce Aug. 8, 2014) ("Final Determination"); see also Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Certain Oil Country Tubular Goods from Taiwan, A-583-850 (Dep't of Commerce July 10, 2014), available at http://enforcement.trade.gov/frn/summary/taiwan/2014-16861-1.pdf (last visited this date) ("Decision Memorandum"); Antidumping Duty Investigation of Certain Oil Country Tubular Goods from Taiwan: Proprietary Issues (Dep't of Commerce July 10, 2014), CD 388 ("Confidential Decision Memorandum").[1]

Before the court are the motions for judgment on the agency record of Consolidated Plaintiffs Tension Steel Industries Co., Ltd. ("Tension") and Maverick Tube Corporation ("Maverick"). Mem. of Points & Authorities in Supp. of Pl. Tension Steel Industries Co., Ltd.'s R. 56.2 Mot. for J. on the Agency R., ECF No. 42 ("Tension Br."); Consol. Pl. Maverick Tube Corporation's Mot. for J. on the Agency R., ECF No. 45 ("Maverick Br."); see also Def.'s Opp. to Pls.' R. 56.2 Mots. for J. on the Agency R., ECF No. 61 ("Def.'s Resp."); Intervenor-Def. Maverick Tube Corporation's Resp. to Tension's Mem. in Supp. of its R.56.2 Mot. for J. on the Agency R., ECF No. 65; Resp. of

---

[1] "CD" refers to a document contained in the confidential administrative record.

Tension Steel Industries Co., Ltd. to Consol. Pls.' Mots. for J. on the Agency R.,

ECF No. 66; Mem. in Opp. to Tension Steel Industries Co.'s Mot. for J. on the Agency R.

Filed by Def.-Intervenor United States Steel Corporation, ECF No. 67; Reply Br. of Pl.

Tension Steel Industries Co., Ltd., ECF No. 72; Consol. Pl. Maverick Tube Corporation's

Reply Br., ECF No. 74 ("Maverick Reply"). Consolidated Plaintiff United States Steel

Corporation also moves for judgment on the agency record adopting Maverick's

arguments by reference. Mot. of Pl. U.S. Steel Corp. for J. on the Agency R. under R. 56.2

1-2, ECF No. 43; see also Reply Br. in Supp. of Pl. United States Steel Corporation's Mot.

for J. on the Agency R. Under R. 56.2. The court has jurisdiction pursuant to Section

516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i)

(2012),[2] and 28 U.S.C. § 1581(c) (2012).

For the reasons that follow, the court remands the Final Determination on the

rebate issue Tension raises in its motion, but sustains the Final Determination on each of

the issues Maverick raises in its motion.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless

they are "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing

agency determinations, findings, or conclusions for substantial evidence, the court

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2016). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8-8A, West's Fed. Forms, National Courts § 3.6 (5th ed. 2015).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."). More specifically, when reviewing Commerce's interpretation of its regulations, the court must give substantial deference to Commerce's interpretation,

Torrington Co. v. United States, 156 F.3d 1361, 1363-64 (Fed. Cir. 1998), according it

"'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, (1994) (citations omitted); accord

Viraj Group v. United States, 476 F.3d 1349, 1355 (Fed. Cir. 2007).

## II. Discussion

### A. Tension's Rebate Issue

Tension challenges the lawfulness of Commerce's refusal to accept some of

Tension's proposed rebate adjustments to certain home market sales. The statute directs

Commerce to calculate normal value using "the price at which the foreign like product is

first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i).

Commerce's regulations explain that the price used for normal value will be "a price that

is net of any price adjustment . . . that is reasonably attributable to the . . . foreign like

product." 19 C.F.R. § 351.401(c) (2015). The regulations define a "price adjustment" as

"any change in the price charged for subject merchandise or the foreign like product, such

as discounts, rebates and post-sale price adjustments, that are reflected in the

purchaser's net outlay." 19 C.F.R. § 351.102(b)(38) (emphasis added).

Commerce has developed a practice of rejecting claimed rebate adjustments when

a respondent's customers lacked knowledge of the terms and conditions of the rebates

at or before the time of sale. See, e.g., Issues and Decision Memorandum for the

Antidumping Duty Administrative Reviews of Ball Bearings and Parts Thereof from

France, Germany, Italy, Japan and the United Kingdom 63-64 (Dep't of Commerce

July 14, 2006), available at http://enforcement.trade.gov/frn/summary/multiple/E6-11123-

1.pdf (last visited this date) ("It is [Commerce]'s practice to adjust normal value to account for rebates when the terms and conditions of the rebate are known to the customer prior to the sale and the claimed rebates are customer-specific."); Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Canned Pineapple Fruit from Thailand 3-5 (Dep't of Commerce Dec. 7, 2006), available at http://enforcement.trade.gov/ frn/ summary/ thailand/ E6-20779-1.pdf (last visited this date) ("[W]here a price adjustment made after the fact lowers a respondent's dumping margin, [Commerce] will closely examine the circumstances surrounding the adjustment to determine whether it was a bona fide adjustment made in the ordinary course of business.").

Citing this practice, Commerce rejected adjustments for rebate payments Tension made pursuant to sales contracts that did not specifically include a rebate clause. Decision Memorandum at 11. According to Commerce the only "legitimate rebates" Tension proffered were those that customers knew about at or before the time of the sale. Id.

Tension argues that Commerce's practice of rejecting rebate adjustments when it is not satisfied that customers were aware of the terms and conditions of the rebate at the time of the sale violates a recent decision of the court, Papierfabrik August Koehler AG v. United States, 38 CIT ___, 971 F. Supp. 2d 1246 (2014), in which the court held that such a practice contravenes the plain language of Commerce's regulations. Tension Br. at 1-18. The court agrees. In Papierfabrik, the court explained that the plain language of Commerce's regulations require it to calculate normal value "net of any price adjustment

. . . that is reasonably attributable to the . . . foreign like product" that "are reflected in the purchaser's net outlay." Id. at ___, 971 F. Supp. 2d at 1252-53 (quoting 19 C.F.R. §§ 351.102(b)(38), 351.401(c)) (emphasis in original). Consequently, Commerce's practice of rejecting rebates even though they are "reasonably attributable to the . . . foreign like product" and "are reflected in the purchaser's net outlay" violates the regulation. Id. at ___, 971 F. Supp. 2d at 1252-53; see 19 C.F.R. §§ 351.102(b)(38), 351.401(c).

Commerce noted that Papierfabrik "is not final." Decision Memorandum at 10. Defendant, for its part, also urges that court disregard Papierfabrik, and argues that Commerce's rebate practice is consistent with the regulation. See Def.'s Resp. at 24-32. Papierfabrik is now final, and rather than appeal, Commerce chose to amend the regulation instead. Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 79 Fed. Reg. 78,742 (Dep't of Commerce Dec. 31, 2014) (proposed rule and request for comment).

As Papierfabrik noted, "[t]he regulatory provisions unambiguously require that rebates and other post-sale downward adjustments in the price charged for the foreign like product that are reflected in the purchaser's net outlay be reflected in the starting price Commerce uses for determining normal value." Papierfabrik, 38 CIT at ___, 971 F. Supp. 2d at 1257. The court therefore remands this issue to Commerce to accept Tension's rebate adjustments. Id.

## B. Maverick Issues

## 1. VAT

In the final determination Commerce rejected Maverick's argument that Commerce should deny respondent Chung Hung Steel Corp. ("CHS") a value added tax ("VAT") adjustment:

> We disagree with the petitioners' argument that [Commerce] should include in the reported costs the amount of any VAT that was not refunded. Section 773(e) of the Act provides that, for purposes of calculating constructed value, "the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted or refunded upon exportation of the subject merchandise produced from such materials." The purpose of this provision is to ensure an appropriate comparison between export sales of subject merchandise, upon which no VAT taxes are charged, and the constructed value of that merchandise, when any VAT costs incurred in purchasing the inputs are remitted or refunded upon exportation. CHS reported that a VAT of 5 percent is levied on purchases of inputs and home market sales of finished goods, while export sales are not subject to VAT. CHS further stated that during the [period of investigation], the input VAT paid on purchased inputs was largely offset by the output VAT collected from home market sales of finished goods. CHS stated that the balance is completely refunded by the tax authority.
>
> CHS pays VAT on purchases of goods and services and collects VAT on sales to its customers. While CHS does not collect VAT on export sales, it is granted a credit to offset the appropriate VAT. In OCTG Mexico, [Commerce] explained that, "[e]ven if the amount 'not exacted' in a given month were to be less than the amount paid as VAT to suppliers in that month, the amounts associated with VAT paid on inputs to exported merchandise are still 'pardoned.'" [Commerce] only requires that a respondent demonstrate that it is entitled to a VAT refund on exports and can offset VAT paid on domestic market sales because there are timing differences between the purchases of raw materials and the subsequent collection of VAT from the customer. Moreover, CHS does not have a domestic market for OCTG and we are relying on Canadian sales for NV, which would also be subject to the export refund.

<u>Decision Memorandum</u> at 18-19 (footnotes omitted) (quoting Issues and Decision Memorandum for the 1998-1999 Administrative Review of Oil Country Tubular Goods from Mexico, at Hysla cmt. 2 (Dep't of Commerce Mar. 21, 2001), <u>available at</u> http://enforcement.trade.gov/frn/summary/mexico/01-6913-1.txt (last visited this date) ("<u>OCTG Mexico</u>"). In its opening brief, Maverick acknowledges Commerce's existing VAT practice pursuant to which it "requires only that a respondent demonstrate that it (1) is entitled to a VAT refund on exports, and (2) can offset VAT paid on domestic market sales because there are timing differences between the purchases of raw materials and the subsequent collection of VAT from the customer." Maverick Br. at 25-26 (citing <u>Decision Memorandum</u> at 19).

So to be clear, "to account for the timing differences between raw material purchases and subsequent VAT recoupment, Commerce requires only that a respondent demonstrate <u>entitlement</u> to a VAT refund on exports. Commerce does not require that a respondent document that every VAT payment was refunded during the period of investigation or outside the period of investigation." Def.'s Resp. at 21-22 (citing <u>OCTG Mexico</u> at Hysla cmt. 2) (emphasis in original).

Maverick highlights a difference between the amount of VAT paid on inputs during the period of investigation ("POI") and the amount of VAT collected on sales and refunded on exports. Maverick Br. at 25 (citing CHS's Supplemental Section D Questionnaire Response at Ex. 3SD-8 (Dep't of Commerce Jan. 15, 2014), CD 206-07). As explained above, however, under Commerce's VAT practice such a difference is unremarkable and to be expected because of timing differences between raw material purchases and the

subsequent collection of VAT from customers. <u>Decision Memorandum</u> at 18-19. For Maverick though, "CHS's historical treatment of VAT appears incongruent with Commerce's allocation of it for the final determination," leading Maverick to conclude that Commerce's handling of VAT "was unsupported by substantial evidence and otherwise not in accordance with the law." Maverick Br. at 26.

It is difficult to identify merit in a substantial evidence challenge to Commerce's factual findings on the VAT issue (<u>e.g.</u>, the existence of the Taiwan VAT regime, how CHS accounted for VAT within its books and records). It is also difficult to identify merit in a substantial evidence challenge to Commerce's application of its VAT practice to those findings (the reasonableness of Commerce's application of its VAT practice to the facts of this administrative record). CHS reported that Taiwan levies a five percent VAT on input purchases but exempts export sales from VAT. <u>Decision Memorandum</u> at 18. Maverick does not appear to challenge the Taiwan VAT regime. Maverick, for example, did not proffer to Commerce any affidavits, declarations, or other information from Taiwanese tax experts analyzing the Taiwan VAT regime. Commerce found that under that regime CHS was entitled to a credit to offset any VAT applied on input purchases used to produce subject merchandise that was exported. <u>Id.</u> at 18-19. Maverick did not proffer any information from Taiwanese tax experts that CHS was somehow not entitled to such a credit. CHS explained, and Commerce accepted, that during the POI, the VAT on input purchases for export sales was "largely offset" by the output VAT collected from home market sales of finished goods. <u>Id.</u> at 18. The remainder, CHS reported, and Commerce accepted, "is completely refunded by the tax authority." <u>Id.</u> Maverick believes this is

unlikely, but again, Maverick did not proffer, for example, an opinion letter from a Taiwanese tax expert that confirmed Maverick's suspicions. Defendant explains that Commerce, consistent with its practice and in recognition of timing differences between purchases of raw materials and the subsequent collection of VAT from customers, did not limit CHS's VAT refunds to those offsets that occurred during the POI as Maverick would have preferred. Def.'s Resp. at 21-23. In other words, Commerce did not require anything more than evidence that CHS was entitled under Taiwanese law to VAT refunds for export sales. Id. As a result, Commerce used CHS's books and records, which excluded VAT that happened not to have been refunded during the POI. Decision Memorandum at 18-19. The court cannot fault this determination as unreasonable (unsupported by substantial evidence).

Beyond substantial evidence issues, Maverick also vaguely suggests that Commerce's VAT adjustment is "otherwise contrary to law." Maverick Br. at 25-26. Maverick, however, does not frame that "legal" argument against an applicable standard of review. For example, Maverick chose not to analyze the legality of Commerce's VAT practice within the Chevron framework. The court therefore declines to entertain Maverick's asserted but unanalyzed "legal" challenge to Commerce's VAT practice. See Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

## 2. Date of Sale

Commerce used the date of shipment as the date of sale for CHS. Decision Memorandum at 13-14; Confidential Decision Memorandum at 12. Maverick challenges this determination, arguing that Commerce misapplied its date of sale regulation, 19 C.F.R. § 351.401(i). Maverick Br. at 26-27; Maverick Reply at 12-14.

Pursuant to its regulation, Commerce has a rebuttable presumption in favor of invoice date for the date of sale. 19 C.F.R. § 351.401(i). Commerce "may," however, "use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." Id.; see generally Yieh Phui Enter. Co. v. United States, 35 CIT ___, ___, 791 F. Supp. 2d 1319, 1322-24 (2011) (describing in detail Commerce's date of sale regulation).

Commerce found that CHS has the following sales process for its United States and comparison market sales:

- First, CHS and its customers entered into sales contracts preliminarily specifying the terms of sale—price, quantity, payment terms, and delivery terms. The material terms of sale could be altered during the period of time following these sales contracts. CHS documented one example of the material terms changing between the preliminary sales contract and the date of shipment.

- Second, CHS would ship to its customers. Commerce verified that changes could be made to the material terms of sale up to the date of shipment.

- Third, at some time after date of shipment, CHS would issue an invoice.

Decision Memorandum at 13-14 (citing record sources). Commerce determined that the material terms of sale were not fixed when CHS concluded sales contracts with its

customers. Id. at 13. Rather, Commerce found that the material terms of sale could change—and in at least one instance did change—during the period between the contract date and the date of shipment. Id. CHS issued invoices to its customers only after the date of shipment. Id. at 13-14. Commerce therefore determined that the material terms of sale were established on the date of shipment, not the subsequent date of invoice. See id. at 13-14; see also Confidential Decision Memorandum at 12.

This determination followed Commerce's practice for cases in which the date of shipment precedes the date of invoice. Decision Memorandum at 14 (citing Certain Polyester Stable Fiber from Korea, 74 Fed. Reg. 27,281, 27,283 (Dep't of Commerce June 9, 2009) (prelim. results) unchanged in 74 Fed. Reg. 65,517 (Dep't of Commerce Dec. 10, 2009) (final results)); but see U.S. Steel Corp. v. United States, 37 CIT ___, ___, 953 F. Supp. 2d 1332, 1340 (2013) (noting in dicta that relying on administrative practice alone—of using shipment date when it precedes invoice date—"would seem not to be enough to satisfy the standard that the regulation, written by Commerce, provides").

Commerce explained that the record evidence here demonstrated that the material terms of CHS's sales were subject to change until the date of shipment, which preceded the date of invoice. Decision Memorandum at 13-14. There is, of course, a baked in practical logic to this practice. When a party ships its product to a customer, it is reasonable to assume that the material terms of the sale have been established. See, e.g., Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 64 Fed. Reg. 38,756, 38,768 (Dep't of Commerce July 19, 1999) (final determ.) (["Commerce"] does not consider dates subsequent to the date of shipment from the factory as

appropriate for date of sale."); Issues and Decisions Memorandum for the Administrative Review of Stainless Steel Bar from Japan, cmt. 1 (Dep't of Commerce Mar. 14, 2000), available at http://enforcement.trade.gov/frn/summary/japan/00-6264-1.txt (last visited this date) ("In keeping with [Commerce's] practice, the date of sale cannot occur after the date of shipment."). Here, once the merchandise is shipped, the terms are set, and there are no changes in those terms when CHS subsequently issues the invoice. And indeed, Maverick has not identified any such changes on this record. The court therefore sustains as reasonable Commerce's use of shipment date as the date of sale for CHS.

### 3. Treatment of Non-Prime Pipe

In the final determination Commerce valued CHS's non-prime pipe at the net recovery price rather than the full cost incurred to produce the product. Maverick argues that Commerce should have rejected this offset because the non-prime pipe is a by-product of OCTG, and CHS's reported costs already account for scrap sales at standard cost. Maverick Br. at 23-25.

The statute directs Commerce to use the normal books and records of the exporter or producer if such records are kept in accordance with Generally Accepted Accounting Principles ("GAAP") and reasonably reflect the costs associated with the production and sale of subject merchandise. 19 U.S.C. § 1677b(f)(1)(A). When Commerce encounters downgraded pipe, it evaluates the extent to which the downgraded product differs from subject merchandise. Decision Memorandum at 16. A downgraded product so different that "it no longer belongs to the same group and cannot be used for the same applications" typically indicates the diminishment of market value "to a point where its

production costs cannot be recovered." Id.; see also Issues and Decision Memorandum for the Antidumping Administrative Review of Circular Welded Carbon Steel Pipes and Tubes from Thailand, A-549-502, at 16-18 (Dep't of Commerce Oct. 3, 2012), available at http://enforcement.trade.gov/ frn/ summary/ thailand/ 2012-25040-1.pdf (last visited this date). Commerce's stated practice is to determine whether downgraded products may fulfill the same applications as subject merchandise rather than attempt to parse the relative values and qualities between grades. Decision Memorandum at 16. If the downgraded products cannot fulfill the same applications as the subject merchandise, Commerce will grant an offset to reflect the market value of the downgraded merchandise.

In accordance with GAAP, Commerce values by-products at their market price to avoid overstating inventory accounts on the balance sheet. Id. Indeed, pursuant to the "lower cost or market—LCM" practice, GAAP prohibits companies from valuing products held in inventory at an amount that exceeds their market price. Id. The court has affirmed Commerce's valuation of by-products at the net recovery price. E.I. DuPont De Nemours & Co. v. United States, 20 CIT 373, 377-78, 932 F. Supp. 296, 300-01 (1996) (recognizing that "assigning [recycled] pellets the cost of virgin chips would overstate the actual costs of PET film production").

Commerce preliminarily disallowed CHS's adjustment for non-prime pipe and thus did not account for the field "Adjustment due to Non-Prime Pipes" in CHS's reported costs. See Decision Memorandum at 14. However, in light of further development of the record and on-site verification of CHS, Commerce realized that it had not given CHS "credit for the value of the non-prime pipes as they are treated in their normal records." CHS Cost

Verification Report at 3 (Dep't of Commerce Apr. 23, 2014), CD 380. In its normal books and records, CHS valued this non-prime pipe using its market price. <u>Decision Memorandum</u> at 16. Non-prime pipe may be sold for structural application, such as in construction and highway gantry, but is not sold as OCTG. <u>Id.</u> (citing CHS Section D Response at D-5 (Dep't of Commerce Oct. 28, 2013), CD 49-50 ("CHS Sec. D. Resp.")). Given these facts and its practice with regard to non-prime by-products, Commerce valued the down-graded pipe at net recovery price rather than the full cost incurred to produce the product. <u>Id.</u> at 15-17. Commerce explained that setting the cost of down-graded pipe at the net recovery price of the product is consistent with GAAP, which, to avoid the overstatement of inventory accounts on the balance sheet, does not allow companies to value products held in inventory at an amount greater than their market price. <u>Id.</u> Thus, Commerce found that CHS is not permitted under GAAP to value the non-prime pipe at the cost of prime OCTG. <u>Id.</u>

Here, CHS's non-prime pipe is properly classified as a by-product of the production of OCTG. In pipe making, there is no simultaneous production process up to a split point, so there are no co-products. <u>See</u> <u>Decision Memorandum</u> at 15. Pipes are made sequentially on a production line, and costs and production activities are generally identifiable to individual products. <u>Id.</u> At the end of the production line, the pipes are evaluated for quality to determine if they are fit for use as OCTG or are non-prime. <u>Id.</u> Commerce determined that the non-prime pipe is a by-product of OCTG production, a finding Maverick does not challenge in its brief.

Valuing the cost of non-prime pipe at the net recovery price of the product is consistent with GAAP. Decision Memorandum at 16. As noted above, to avoid the overstatement of inventory accounts on a company's balance sheet, GAAP does not allow companies to value products held in inventory at an amount greater than their market price. See id. Thus, CHS is not allowed under GAAP to value the non-prime pipe at the cost of prime OCTG, and CHS in its normal records does not do so. See id. Rather, CHS assigns a cost to non-prime pipe equal to the net market price. See id. Commerce found in the final determination that assigning costs "based on market value is a well-established practice in cost accounting and accepted under GAAP." Id. at 17. The practice of assigning costs based on market value has also been upheld by the U.S. Court of Appeals for the Federal Circuit. See PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 764-65 (Fed. Cir. 2012). Commerce thus reasonably used the net recovery price to value the non-prime pipe and granted CHS an offset to its reported costs in that amount to account for the by-product.

Maverick argues that Commerce's practice "supports a finding that CHS's non-prime pipe is a by-product." Maverick Br. at 23. Specifically, Maverick cites two cases in which Commerce treated lower-grade products generated in producing the subject merchandise as by-products rather than "joint products" (that is, co-products). Maverick Br. at 22-23 (citing Issues and Decision Memorandum for the Final Results and Rescission, in Part, of the Antidumping Duty Administrative Review of Fresh Garlic from the People's Republic of China, A-570-831, at 30-32 (Dep't of Commerce June 10, 2013), available at http://enforcement.trade.gov/frn/summary/prc/2013-14329-1.pdf (last visited

this date); Issues and Decision Memorandum for the Antidumping Duty Investigation of

Certain Orange Juice from Brazil, A-351-840, at 34-42 (Dep't of Commerce Jan. 13,

2006),  available at  http://enforcement.trade.gov/frn/summary/brazil/E6-333-1.pdf  (last

visited this date) ("Orange Juice from Brazil")). Maverick's argument is confusing because

it advocates the very determination Commerce reached—that CHS's non-prime pipe is a

by-product—but leaves unexplained how this relates to the offset for non-prime pipe. See

Maverick Br. at 22-24. See also Decision Memorandum at 16 (explaining that "[i]n its

normal books and records, CHS treats non-prime pipe as by-products" and then uses the

value in those books and records to value the non-prime pipe). Neither case cited by

Maverick conflicts with Commerce's practice of valuing downgraded product at the net

recovery price. And in Orange Juice from Brazil Commerce allowed the respondents' by-

product revenue offset for orange juice by-products. Orange Juice from Brazil at 39-42.

Maverick argues that Commerce's non-prime pipe offset is improper because

CHS's cost database, without the "Adjustment Due to Non-Prime Pipes" field, represents

CHS's cost of manufacturing in its normal records and already includes the offset for

scrap and non-prime pipes. See Maverick Br. at 24. Defendant notes that "[t]he factual

record refutes Maverick's assertion," Def.'s Resp. at 20, and the court agrees. Commerce

found that "CHS did not include in the cost buildups the normal offset for non-prime pipe,

thus without adjusting for this offset, costs would be overstated." Decision Memorandum

at 17; see CHS Sec. D. Resp. at D-42. CHS's Section D Response states that the cost of

manufacturing that it reported to Commerce uses "only the production quality of prime

quality to absorb and share the aggregate costs." CHS Sec. D. Resp. at D-43. CHS then

explained that the adjustment reflected in Field 7.2 is necessary because non-prime products should be included in the pool of production volume to share and absorb part of the aggregated costs. Id. Commerce found in the final determination that CHS's reported costs excluding the adjustment for non-prime pipe did not account for the offset for non-prime pipe normally recorded in their books and records. See Decision Memorandum at 17.

More broadly, Maverick argues that Commerce's "shift in decision" between its preliminary and final determinations fails "to provide a rational connection to the conclusion drawn." Maverick Br. at 24. Commerce fully explained its determination to value downgraded non-prime pipe at the net recovery cost. See Decision Memorandum at 15-16. As described above, this determination followed Commerce's practice with regard to downgraded product that is not suitable for the same applications as subject merchandise. Accordingly, it is a reasonable determination that the court must sustain.

### 4. Rebates

Maverick argues that Commerce unreasonably declined to reject every one of Tension's claimed rebate adjustments. Maverick claims that the "Price Rebate Statements" Tension offered in support of its proposed offsets were created on a confidential date well after the date Tension claimed it began offering rebates to its customers. Maverick Br. at 20-21. To Maverick, this discrepancy indicates that Tension provided inadequate supporting documentation and that Tension's price rebate statements did not connect to Tension's sales. See Maverick Br. at 19-21.

The court is not persuaded. In considering Tension's requested rebate adjustments, Commerce identified certain Tension sales contracts with rebate clauses stipulating that Tension would pay a rebate conditioned upon Tension itself receiving a rebate. Confidential Decision Memorandum at 10-11. Commerce requested, and Tension provided, copies of every Price Rebate Statement applicable to OCTG for the POI, which specify the particular sales contracts for which Tension granted rebates. Commerce verified those rebate amounts during its on-site verification. Id. Commerce found that Tension's requested rebates were attributable to certain sales made during the POI. Id. at 10-11; see Decision Memorandum at 11-12.

The only issue Maverick identifies with Tension's Price Rebate Statements to substantiate its claim is the apparent timing discrepancy. Maverick Br. at 17-22. As explained, however, Tension's Price Rebate Statements detail the link between particular sales contracts and rebates Tension paid in accordance with those contracts. Confidential Decision Memorandum at 10-11. When Commerce asked Tension about the apparent timing discrepancy, Tension explained that the Price Rebate Statements may include rebates paid on sales made in prior years. See id. at 11; Tension Sales Verification Report at 12-13 (Dep't of Commerce Apr. 4, 2013), CD 378 ("Tension Verification"). Maverick may doubt the reliability of Tension's explanation and documentation, but Commerce was able to verify all of Tension's proposed rebate amounts while on-site in Taiwan. Confidential Decision Memorandum at 10-11. The court therefore sustains Commerce's reasonable decision to grant Tension's proposed rebate adjustments.

### 5. Affiliation

Maverick challenges Commerce's conclusion that Tension and its supplier, Company A, were not affiliated by virtue of a close supplier relationship.

The statute defines "affiliated persons" in relevant part as "[a]ny person who controls any other person and such other person." 19 U.S.C. § 1677(33)(G). Affiliation requires a finding of "control," which the statute defines as "legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33). Commerce's regulations specify that "control" means a "relationship [that] has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise." 19 C.F.R. § 351.102(b)(3).

In determining whether control exists, Commerce considers, among other factors, "close supplier relationships." Id.; see also Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 838 (1994) (control sufficient to establish affiliation may be demonstrated "for example, through . . . close supplier relationships") ("SAA"). A close supplier relationship is a control relationship when "the supplier or buyer becomes reliant upon the other." SAA at 838 (emphasis added). Commerce has a two-part analysis to determine whether a close supplier relationship is a control relationship. Commerce first considers whether a party has demonstrated that "the relationship is significant and could not be easily replaced"—that the buyer or supplier has become reliant on the other. TIJID, Inc. v. United States, 29 CIT 307, 321, 366 F. Supp. 2d 1286, 1299 (2005) (affirming Commerce's determination that supplier's sale of 100 percent of its candles to TIJID did not itself establish a close supplier relationship). "Only if Commerce determines

that there is reliance does it evaluate whether the relationship of reliance has the potential

to impact decisions relating to subject merchandise." Id.

Maverick argues that Commerce erred in failing to find that Tension is not reliant

on its supplier—Company A—and therefore not affiliated through a "close supplier"

relationship. Maverick Br. at 4-5. This issue was briefed and argued extensively below.

See Decision Memorandum at 3-6; Confidential Decision Memorandum at 2-8. Maverick

attempted without success to persuade Commerce as a factual matter that Company A

controlled Tension because Tension sourced a large proportion of its hot-rolled coil during

the POI from Company A, and Tension used a factoring arrangement involving debt

financing for a small fraction of its purchases from Company A. Maverick also tried to

argue that the facts of this case were "nearly identical" to Stainless Steel Wire Rod from

Korea, 63 Fed. Reg. 40,404, 40,410 (Dep't Commerce July 29, 1998) (final results)

("SSWR from Korea") in which Commerce collapsed entities based on a close supplier

relationship.

Maverick repeats these same arguments here. Maverick Br. at 5-13. As for the

factoring arrangement, Commerce determined it was inconsequential, Confidential

Decision Memorandum at 8, a reasonable finding that the court cannot upend.[3]

---

[3] Commerce explained that the program accounted for just **[[          ]]** of the POI and
only **[[      ]]** of the **[[   ]]** line items for short-term New Taiwan Dollar borrowings in the
general ledger **[[                    ]]**. Confidential Decision Memorandum at 8.
Commerce determined that the **[[                    ]]** of the arrangement did not evince
control of Tension by Company A. Id.

Commerce also distinguished the facts of <u>SSWR from Korea</u>, explaining that "in <u>SSWR</u> <u>from Korea</u>, we found that 'Dongbang has not obtained suitable black coil from alternative sources but continues to exclusively rely upon POSCO/Changwon for this input,'" whereas "in this investigation, Tension did find and bought suitable hot-rolled steel coil from alternative suppliers." <u>Decision Memorandum</u> at 5. Commerce therefore reasonably concluded that the facts of <u>SSWR from Korea</u> were not "nearly identical" to the facts of this case.

Maverick also claimed that Tension's sales contracts barred Tension from sourcing from other suppliers. <u>Confidential Decision Memorandum</u> at 3, 7. Maverick repeats this argument again before the court. Maverick Br. at 8. Commerce rejected the argument, explaining that Commerce found nothing on the record or during its on-site verifications in Taiwan to indicate that the agreements precluded Tension from sourcing from other suppliers <u>outside</u> of the People's Republic of China. <u>Confidential Decision Memorandum</u> at 7; <u>see also</u> Tension Verification at 3. Maverick does not address Commerce's analysis on this point. <u>See</u> Maverick Br. at 8; Maverick Reply at 2-8.

On the specific issue of Company A supplying Tension's inputs, Commerce found that Company A did not control Tension through a close supplier relationship. <u>Decision Memorandum</u> at 5-6; <u>Confidential Decision Memorandum</u> at 7-8. Commerce acknowledged that Tension purchased a large share of its coil from Company A during the POI, but Commerce found that "Tension could, and did, look to other unaffiliated suppliers of the input." <u>Decision Memorandum</u> at 5 (citing Tension Supplemental Response, exs. 1-2 (Dep't of Commerce Dec. 6, 2013), CD 130-31). Commerce reasoned

that Tension's purchases from Company A resulted not from compulsion, but sound business choices. Confidential Decision Memorandum at 7. Specifically, (1) Company A could deliver in a more timely fashion than foreign suppliers and (2) Tension observed that "the quality of the coil is good." Tension Verification at 3. Commerce determined that, although these advantages led Tension to purchase a large share of its coil during the POI from Company A, they did not establish the absence of commercially viable alternative suppliers or that Tension would fail if forced to look to other suppliers. Confidential Decision Memorandum at 7.

Maverick emphasizes that Company A has a strong position in the market as a supplier of inputs for OCTG. Maverick argues that "it is simply not possible to quickly replace this supplier." Maverick Reply at 3. Perhaps. The administrative record does not reveal with certainty what would happen if Company A decided to terminate the supply of inputs to Tension. Maybe Tension would fail immediately; maybe Tension would pivot quickly, and do what was necessary to survive. Maverick infers the former. Commerce inferred the latter. This administrative record does not mandate one and only one inference. It may not be optimal in the short term for Tension to replace Company A, but Commerce's inference that Tension's replacement of Company A would not result in its failure is not unreasonable.

The court agrees with Defendant that "consistent with its regulations and past practice, Commerce determined that the record evidence—in particular, Company A's role as Tension's predominate coil supplier and a seldom-used factoring arrangement—

did not suffice to affiliate Tension and Company A." Def.'s Resp. at 10. The court therefore sustains Commerce's determination not to treat Tension and Company A as affiliated.

### 6. Collapsing

Maverick argues that Commerce should have collapsed Tension with Company A's parent, Company B. The collapsing result advocated by Maverick depended upon a finding of affiliation between Tension and Company A. See Maverick Br. at 13. Commerce, however, determined that Tension and Company A were not affiliated, a result the court has sustained above. Defendant explains that if Tension is not affiliated with Company A, Commerce could not collapse Tension with Company A's parent, Company B. Def.'s Resp. at 10-12. Defendant also notes that "Maverick does not argue that its collapsing argument could survive without affiliation between Tension and Company A." Id. at 12 (citing Maverick Br. at 13-17). The court agrees with Defendant and therefore sustains Commerce's decision to not collapse Tension with Company A's parent, Company B.

### III. Conclusion

In accordance with the foregoing, it is hereby

**ORDERED** that Maverick's and United States Steel Corporation's respective Motions for Judgment on the Agency Record are denied; it is further

**ORDERED** that the Final Determination is sustained as to Commerce's treatment of VAT, date of sale, non-prime pipe, affiliation, collapsing, and Commerce's decision to accept certain Tension rebate adjustments; it is further

**ORDERED** that Tension's Motion for Judgment on the Agency Record is granted; it is further

**ORDERED** that this action is remanded to Commerce to grant Tension's remaining proposed rebate adjustments; it is further

**ORDERED** that Commerce shall file its remand results on or before July 15, 2016; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page/word limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated: May 16, 2016
          New York, New York